UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------x
UNITED STATES OF AMERICA          :
                                  :
                                  :      Case No. 3:20-cr-0047-JCH
          v.                      :
                                  :
                                  :
    NORMAN NEWMAN                  :
                                  :
-------------------------------------------------x
```

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANT'S MOTION TO DISMISS OR,
IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS**

Douglas R. Jensen
Thomas Enering
White & Case, LLP
1221 Avenue of the Americas
New York, NY 20020-1095
Douglas.Jensen@whitecase.com
(212) 819-8513

Attorneys for Norman Newman

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS .................................................................................... 3

    A.   Mr. Newman's Background .................................................................. 3

    B.   The List Brokerage Business ................................................................ 4

    C.   The Industry Specific Law and Regulations Applying to List Brokers .... 6

    D.   Lack of FTC or DOJ Prosecutions of List Brokers ............................... 10

    E.   Mr. Newman's 2012 Contact with DOJ .............................................. 10

    F.   DOJ's September 2016 Initiative ......................................................... 12

    G.   The Indictment .................................................................................. 13

ARGUMENT ..................................................................................................... 15

POINT I  THIS PROSECUTON VIOLATES MR. NEWMAN'S  RIGHT TO DUE
             PROCESS UNDER THE FIFTH AMENDMENT OF THE CONSTITUTION .. 15

POINT II  IN THE ALTERNATIVE, THE COURT SHOULD ORDER THE
             GOVERNMENT TO PROVIDE A BILL OF PARTICULARS ........................ 20

    A.   Applicable law .................................................................................. 20

    B.   Discussion ......................................................................................... 23

POINT III  THE COURT SHOULD ORDER THE GOVERNMENT  TO PROVIDE
             ADDITIONAL PRETRIAL DISCOVERY ............................................... 27

    A.   Notification of Intent to Use 404(b) Evidence ...................................... 27

    B.   Identification of Trial Exhibits ............................................................ 28

    C.   Identification of Trial Witnesses ......................................................... 28

    D.   Sharing of Summary Charts ............................................................... 30

    E.   Production of 18 U.S.C. § 3500 Materials ........................................... 30

CONCLUSION .................................................................................................. 31

Defendant Norman Newman submits this Memorandum of Law in support of his motion to dismiss the indictment, which violates Mr. Newman's right to due process of law under the Fifth Amendment of the United States Constitution. In the alternative, in the event of denial of his motion to dismiss, Mr. Newman moves for a bill of particulars under Federal Rule of Criminal Procedure 7(f), and for additional pretrial disclosures as described below in Point III.

## PRELIMINARY STATEMENT

This is a novel and unusual prosecution, in which the Department of Justice ("DOJ") stakes out a legal position not previously taken in the industry specific regulations issued by the Federal Trade Commission ("FTC") or in the government's prior enforcement activities. Indeed, faced with the same conduct in an earlier prosecution against a third party, the DOJ called Mr. Newman as a *government* witness without any suggestion that he acted improperly. Now, based on the same conduct, but without any prior notification to him of its change in position, the DOJ charges Mr. Newman as a criminal.

The indictment concerns the brokerage of mailing lists, a business in which Mr. Newman (now age 73) worked for 40 years prior to his 2016 retirement. Working on a commission basis, he brokered transactions between "list owners" (an industry term indicating businesses that lease their mailing lists to others) and "mailers" (an industry term indicating businesses that create and distribute direct mail pieces for which they seek a wider audience). The indictment charges that some of the mailings sent by those mailers during the eleven years between 2005 and 2016 were fraudulent, and that Mr. Newman brokered mailing lists for such mailings with knowledge of their falsity.

The applicable industry specific law, however, both statutory and FTC regulatory, provided no notice that list brokers would bear responsibility for the substance of their clients' mailings or

1

that they had an obligation to review and monitor such mailings prior to facilitating a transaction. By contrast, the FTC *has* imposed such requirements on list brokers in a different context: the brokering of lead lists for telemarketing scripts. Consistent with this statutory scheme, our research has disclosed no prior government prosecution, by either the FTC or DOJ, of a list broker based solely upon its role in brokering a mailing list for a fraudulent mailing, prior to the September 2016 initiative of which this case forms a part. This prosecution, then, represents a reversal of the government's previously stated regulations and enforcement practices.

The government *has*, to be sure, previously prosecuted *mailers* – the parties who conceived and profited from fraudulent mailings. One such example is the case in which Mr. Newman served as a government witness. In that instance, the fraudulent mailer had been Mr. Newman's client, and Mr. Newman had helped that client obtain mailing lists for her fraudulent mailing – the same conduct for which Mr. Newman stands charged today. But far from treating Mr. Newman as a criminal, in that case the DOJ treated him as a good citizen. Without any suggestion that he faced potential charges and needed immunity, a non-prosecution agreement or even his own attorney, the DOJ asked him to testify against his former client and he agreed. After that testimony helped the DOJ secure a conviction, the DOJ sent Mr. Newman back to his list brokerage business with its thanks.

Of course, the government may change its enforcement priorities over time, and the law does not prohibit it from pursuing novel cases. But due process requires that, before the government may prosecute a defendant, it provide that defendant fair notice that his conduct is illegal or improper. This notice requirement is particularly acute in a criminal case where, after a 40-year career in the industry, Mr. Newman's liberty is now at stake. Neither the industry specific

law nor the government's prior enforcement activities gave Mr. Newman such notice, and his only contact with the DOJ prior to this case communicated the opposite.

In the event that the Court denies Mr. Newman's motion to dismiss, it should order the government to provide a bill of particulars. While the indictment makes clear that the principal wrongdoers in this conduct are the "fraudulent mass mailers," the indictment does *not* allege that Mr. Newman participated in a conspiracy with those mailers. Rather, his alleged co-conspirators are other list brokers, with whom he conspired to "help[] [the] fraudulent mass mailers acquire lists of potential victims." (Indictment ¶ 5.) But the indictment fails to allege the contours of this conspiracy to aid and abet, including: which list brokers purportedly acted as Mr. Newman's co-conspirators, which mailers the government contends were "fraudulent," which of their mailings amounted to "fraudulent letters" and, with two exceptions, which of the representations in such letters were false. Nor, while charging a conspiracy that spanned eleven years, from 2005 through 2016, does the indictment identify any key dates or times of relevant conduct. Particularly given the novelty of the government's case, it should be required to spell out these particulars so that Mr. Newman can prepare his defense.

## **STATEMENT OF FACTS**

The below discussion of the facts, unless indicated otherwise, is principally based upon the allegations of the indictment, documents and testimony produced by the government in discovery, and Mr. Newman's prior testimony on behalf of the government.

### A.  **Mr. Newman's Background**

Prior to his retirement in September 2016, Mr. Newman had worked as a list broker for approximately 40 years. (Exhibit A at 29.) He has no criminal record, and his only significant

prior contact with the criminal justice system came in the above-described case in which the DOJ asked him to serve as a government witness in its prosecution of one of his clients.

For the 10 years prior to his retirement, Mr. Newman worked as a list broker at the business referred to in the indictment as the "Company." (Exhibit A at 29.) The Company's offices were located in Brewster, New York from approximately 2005 through 2011, and in Danbury, Connecticut from 2011 onward. (Indictment ¶ 2; Exhibit B at 17.) With approximately 35-40 employees, the Company provided list brokerage and other services to clients in the direct mail business. (Exhibit A at 39.) The types of mailings for which the Company brokered lists spanned multiple areas, including health products, weight loss, nutritional supplements, business opportunities, astrology and sweepstakes. (Exhibit A at 28, 39-40, 43.)

In September 2016, as discussed further below, the DOJ announced a wide-ranging initiative focused not just on mailers, but also on many other participants in the direct mail business, including list brokers.[1] That initiative included a civil complaint against the Company as well as execution of a search warrant at the Company's offices. According to its press release, the DOJ's investigation primarily focused on astrology and sweepstakes mailings, areas in which Mr. Newman had many clients. Faced with these civil and criminal investigations, the Company promptly terminated Mr. Newman's employment.

**B. The List Brokerage Business**

Though not described in the indictment, for the benefit of the Court this Memorandum will provide a brief description of the list brokerage business. List brokers act as intermediaries between mailers and list owners. (Exhibit A at 27.) The mailers develop the substance and content

---

[1]    Press Release, Dep't of Justice, Justice Department and Law Enforcement Partners Announce Civil and Criminal Actions to Dismantle Global Network of Mass Mailing Fraud Schemes Targeting Elderly and Vulnerable Victims (Sept. 22, 2016), https://www.justice.gov/opa/pr/justice-department-and-law-enforcement-partners-announce-civil-and-criminal-actions-dismantle.

of mailings, while the list owners have mailing lists that, if rented, bring those mailings to a wider audience. (Exhibit B at 18-19.)  The job of the list broker is to connect the two, much as a real estate broker connects buyers and sellers of real estate.  (Exhibit A at 27.)

The process typically works as follows.  Once the mailer has created its mailing, it typically sends a sample to the list broker, asking for the broker's recommendation of lists.  (Exhibit B at 37.)  Based on a cursory review[2] to determine the category of mailing – a sweepstakes promotion would require a different mailing list than one for health supplements – the broker would make a recommendation, and typically forward the sample to a suitable list owner or its representative (referred to in the industry as a "list manager") for consideration.  (Exhibit B at 37-38; Exhibit C at 25.)  The list owner could then decide whether to rent its mailing list to the mailer.  (Exhibit B at 38.)  List owners might have various business reasons for declining. (*Id.*)  On occasion, as in the example cited in the indictment (¶ 8), a list owner might decline based on a concern that the mailing was misleading, and in such case no rental would occur.

To the extent a rental did occur the mailer would pay a fee to the list owner.  (Exhibit A at 41-42.)  The amount of those fees differed depending on the list owner, but an average rate was $100 for each 1,000 names rented.  (*Id.*)  The list brokerage firm would receive a commission, typically 20% of the rental fee paid by the mailer ($20, continuing the example stated earlier in this paragraph), and the individual broker at the firm received either a percentage of that commission or a salary.  (*Id.;* Exhibit C at 14, 94-95.)

---

[2]    The indictment (¶ 7) alleges that Mr. Newman "and his co-conspirators knew the content and fraudulent character of their clients' letters because they routinely requested and received sample copies of them during list transactions."  However, in the event this case goes to trial the evidence will show that brokers do not typically scrutinize the samples carefully, among other reasons because, unlike for telemarketing scripts, the FTC never communicated such a requirement for direct mailings.

Once the mailer makes the rental payment for a mailing list and the list broker receives its commission, the role of the list broker is completed. The list broker's name does not appear in mailings, and list brokers do not participate in any of the subsequent steps involved in the mailing's life cycle. (Exhibit A at 43-45.) Among other things, list brokers do not: arrange for the posting of mailings to the names on the mailing list, receive responses from the recipients, process any payments or checks sent in response, handle delivery of any items promised in exchange for payment (referred to in the industry as "fulfillment"), or receive or respond to any customer complaints. (*Id.*; Exhibit B at 36-38; Exhibit D at 36-37.) Any proceeds generated by the mailing go to the mailer, not the list broker (Exhibit A at 41-42; Exhibit D at 36-37.)

### C. **The Industry Specific Law and Regulations Applying to List Brokers**

The federal agency with primary responsibility for the protection of consumers and policing of deceptive business practices is the FTC. While that agency has provided guidance to list brokers, that guidance has specifically focused on one type of selling: telemarketing. Through the promulgation of specific rules and issuance of consent decrees, the FTC has made explicitly clear that, at least in the realm of telemarketing, list brokers are responsible for the substance of their clients' sales pitches, and must review and monitor telemarketing scripts before brokering a transaction. The FTC has promulgated no such rules, nor issued any such guidance, for the list brokerage of mass mailing campaigns.

In 1994, based on concerns over the growth of telemarketing fraud, Congress enacted the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Fraud Prevention Act"). The Act found that interstate telemarketing "differs from other sales activities" and had "become a problem of such magnitude that the resources of the Federal Trade Commission are not sufficient to ensure adequate protection for such fraud." 15 U.S.C. § 6101 (1)(2). To

address this lack of resources, the Act gave the FTC authority to prescribe rules prohibiting "deceptive telemarketing acts or practices."  15 U.S.C. § 6102.

Armed with this authority, in 1995 the FTC issued the Telemarketing Sales Rule, which prohibits misrepresentations in telemarketing and imposes extensive requirements on telemarketing activities.  *See* 16 C.F.R. § 310.4.  As one of those requirements, the Rule included an "assisting and facilitating" provision which made it a violation "to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged" in deceptive conduct.  16 C.F.R. § 310.3(b).  The FTC's Statement of Basis and Purpose of the Final Rule, issued in August 1995 as part of the notice and comment process for the Telemarketing Sales Rule, provided illustrative examples of the substantial assistance contemplated by this provision, one of which was "providing lists of contacts to a seller or telemarketer . . ."  60 Fed. Reg. 43842 (Aug. 23, 1995) -- in other words, list brokerage.

Giving teeth to this rule, the FTC has brought numerous enforcement proceedings against list brokers and list managers working for telemarketers.  As early as 2004, the FTC brought three separate actions against list management companies that had arranged for rentals or sales of lead lists to telemarketers (the "2004 FTC Proceedings").[3]  Although the companies handled lists for both telemarketers and direct mail campaigns, the FTC complaints focused only on the companies'

---

[3]    Press Release, FTC, List Sellers Settle FTC Charges That They Aided in Illegal Marketing of Advance Fee Credit Products (August 17, 2004), https://www.ftc.gov/news-events/press-releases/2004/08/list-sellers-settle-ftc-charges-they-aided-illegal-marketing.

efforts on behalf of telemarketers.[4]  The complaints alleged that the list companies had knowledge of the telemarketers' illegal sales practices from their receipt of sample scripts, and therefore substantially assisted the unlawful scheme.[5]

In settling these three actions, the FTC served notice that, not only would it hold list companies responsible for the substance of their clients' telemarketing scripts, it would also require them "to obtain and review sample scripts from any other seller or telemarketer prior to renting or selling any list to that seller or telemarketer . . . ."[6]  In effect, it made the list companies responsible for policing their telemarketing clients' scripts, or else face the consequences. Although those companies' businesses included rentals of lists to direct mailers as well as telemarketers, this requirement applied only to "the management, rental, or sale of direct marketing lists *for use in telemarketing*" (emphasis added) and the consent decrees imposed no similar policing duties for direct mailings.[7]

While the FTC thus issued clear guidance to list brokers facilitating transactions for telemarketers, it has issued no such guidance in the field of direct mailing.  Congress has enacted no statute equivalent to the Telemarketing Fraud Prevention Act that would authorize the FTC to

---

[4]    Complaint for Permanent Injunction ¶¶ 7-8, *FTC v. Guidestar Direct Corp*, CV 04-6671 (C.D. Cal. 2004), https://www.ftc.gov/sites/default/files/documents/cases/2004/08/040817stipguidestar.pdf;    Complaint    for Permanent Injunction ¶¶ 7-8, *FTC v. Listdata Computer Services, Inc.*, No. 04-61062 (S.D. Fla. 2004), https://www.ftc.gov/sites/default/files/documents/cases/2004/08/040817stiplistdata.pdf;    Complaint    for Permanent Injunction ¶¶ 7-8, *FTC v. NeWorld Marketing LLC*, No. 04 Civ. 159 (W.D.N.C. 2004), https://www.ftc.gov/sites/default/files/documents/cases/2004/08/040817compneworld.pdf.

[5]    *Id.* ¶¶ 17-19.

[6]    Stipulated Order for Permanent Injunction and Other Equitable Relief at 3, *Guidestar Direct*, No. 04 Civ. 6671, https://www.ftc.gov/sites/default/files/documents/cases/2004/08/040817stipguidestar.pdf; Stipulated Order for Permanent Injunction and Other Equitable Relief at 3, *Listdata Computer Services*, No. 04-61062, https://www.ftc.gov/sites/default/files/documents/cases/2004/08/040817stiplistdata.pdf; Stipulated Order for Permanent Injunction and Other Equitable Relief at 3, *NeWorld Marketing*, No. 04 Civ. 159, https://www.ftc.gov/sites/default/files/documents/cases/2004/08/040817compneworld.pdf.

[7]    *Id.*

promulgate regulations outside of telemarketing, and accordingly the FTC has promulgated no such rules. Thus, while the Telemarketing Sales Rule makes clear that list brokers face sanctions for assisting fraudulent telemarketers, no similar rule applies to list brokers' work with direct mailers. Nor has the FTC issued consent decrees, as it did in the 2004 FTC Proceedings, making clear that list brokers must review and police clients' direct mailings prior to brokering a transaction.

In fact, the statute that the FTC uses to prosecute fraudulent direct mailers gives it no authority to include charges against aiders and abettors. Because it has no specific statute such as the Telemarketing Fraud Prevention Act, the FTC charges direct mailers with violation of the Federal Trade Commission Act (the "FTC Act").[8]  While Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce," the FTC Act includes no "assisting and facilitating" provision such as that contained in the Telemarketing Sales Rule. The FTC bemoaned this lack of aiding and abetting authority in testimony delivered to Congress in 2010, noting that:

> Many individuals and small companies engaged in unlawful practices rely on the support and assistance of other, usually larger, companies. This support and assistance often is instrumental to the success of the scams and allows them to be perpetrated on a much broader scale that would otherwise be possible. Having the ability to prosecute those who make fraud possible by assisting others is a key component of an effective enforcement program.[9]

---

[8]  *See e.g.,  FTC  v.  Next-Gen,  Inc.,  et  al.,*  No.  4:18-CV-00128  (W.D.  Mo.  2018), https://www.ftc.gov/system/files/documents/cases/172_3133_next-gen_stipulated_order_3-7-19.pdf.

[9]  *Financial Services and Products: The Role of the Federal Trade Commission in Protecting Consumers*, 111th Cong.  14-15  (2010)  (statement  of  Jon  Leibowitz,  Chairman,  FTC), https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-financial-services-and-products-role-federal-trade/p064814financial-services.pdf.

Based on this reasoning, the FTC urged Congress to "provide explicit authority for the FTC to take law enforcement action against those who provide substantial assistance to another while knowing, or consciously avoiding knowing, that the person is engaged in unfair or deceptive practices . . ."[10] Notwithstanding this entreaty, to date Congress has not provided the FTC with such authority.

### D.  Lack of FTC or DOJ Prosecutions of List Brokers

Consistent with the above-described regulatory framework, our research has disclosed no FTC enforcement proceedings against list brokers based solely on their list brokerage work for direct mailers.[11]  Nor has it disclosed any such DOJ prosecutions, either criminally or civilly, prior to the September 2016 initiative from which this case springs.  While the DOJ certainly brought cases based upon fraudulent mailings, those prosecutions typically focused on the principal wrongdoers: the mailers themselves.[12]

### E.  Mr. Newman's 2012 Contact with DOJ

In keeping with its pre-initiative position, in 2012 the DOJ treated Mr. Newman as a witness rather than a co-conspirator.  Through the United States Attorney's Office in the District of Arkansas, in *United States v. Sharon Henningsen and Timothy Donovan*, 2:11-CR-20008 (W.D.

---

[10]  *Id.*

[11]  While some FTC cases did include charges against individuals who assisted mailers to obtain mailing lists, those individuals also had significant additional involvement in the scheme charged, including, for example, "providing and maintaining computer software for tracking consumer purchases and collecting payment…formatting and editing mail solicitations…editing telemarketing scripts" and even "exert[ing] indirect control" of the mailer "by virtue of an arrangement to share half of [the mailer's] profits."  *See* Complaint for Permeant Injunction ¶ 26, *FTC v. Consumer Money Markets et al.*, CVS-001071 (D. Nev. 2000), https://www.ftc.gov/sites/default/files/documents/cases/2000/09/cmmcmp.pdf

[12]  *See e.g.,* Press Release, Dep't of Justice, Justice Department Files Enforcement Actions to Shut Down "Psychic" Mail Fraud Schemes (November 19, 2014),  https://www.justice.gov/opa/pr/justice-department-files-enforcement-actions-shut-down-psychic-mail-fraud-schemes

Ark. 2011), the DOJ had brought mail fraud charges against two mailers based in Fort Smith Arkansas, and the DOJ asked him to testify on the government's behalf.[13]

The mailing in that case was fraudulent on its face. It promised victims they could earn "$2,900 TO $5,000 AND MORE WEEKLY!" just by "stuffing and mailing our special letters." (Exhibit E.) In exchange for an application fee that ranged from $59 to $149, the applicant would receive a package containing the necessary envelopes and letters. The applicant needed no "special skills, education, or experience," since:

> As you probably know, STUFFING AND MAILING LETTERS IS ONE OF THE EASIEST JOBS IN THE WORLD. No matter what language you speak or what country you live in, almost everyone knows what you mean when you say "stuffing envelopes." For those who don't know, it means putting a letter or circular into an envelope and sealing. It's that simple!

All the applicant needed to do to earn $2,900 to $5,000 each week was "stuff the envelopes that we send you, with the letters that we send you, and then mail them out so that you can receive your paycheck."

This offer was too good to be true. Once the applicants sent in their application fee, they learned that they would receive payment only upon satisfaction of three conditions: (a) the applicant must mail the stuffed envelope to a third party, not the mailers; (b) the third party must agree to pay $35 for the worthless brochure described in the letter; and (c) the third party must send its $35 to the mailers. (Exhibit F at 3-7.) The government alleged that those conditions would never be met and brought mail fraud charges against the mailers.

---

[13]   Mr. Newman has requested that the government produce any documents in DOJ's possession concerning his testimony in the *Henningsen* case, including for example notes of any communications between the government and Mr. Newman. The government has agreed to produce those materials once received from the District of Arkansas United States Attorneys' Office, but has not yet made production.

Mr. Newman had served as list broker for those mailers for a number of years and communicated with the lead defendant once or twice a month.  (Exhibit A at 28, 34.)  Thus, he engaged in the same conduct that the government now contends makes him a criminal: he "help[ed] fraudulent mass mailers acquire lists of potential victims," in the words of the current indictment (¶ 5).  Nevertheless, the DOJ put him on the stand as a government witness.  Indeed, the purpose of his testimony was to establish the falsity of the very mailings at issue: the payout the mailer promised was based on the assumption that 100% of the third parties who received stuffed envelopes from the victims would send in their $35 for the worthless brochure, and Mr. Newman testified based on his experience as a list broker that such a rate of return was impossible.  (Exhibit A at 29-31; Exhibit F at 3-7.)  But while the government called him to establish the falsity of mailings he himself had brokered, the government did not characterize Mr. Newman as a co-conspirator.  Nor did the government seek a non-prosecution agreement or order of immunity for him, or even arrange for an appointment of counsel.  Instead, it treated him as a lay witness with no criminal exposure.

### F.  **DOJ's September 2016 Initiative**

Four years after Mr. Newman's 2012 testimony, the DOJ did an about face.  Although it had not previously targeted list brokers for prosecution, the DOJ's September 2016 initiative sought to expand DOJ's reach.  The DOJ's September 22, 2016 press release announced a "broader effort" comprised of "wide-ranging enforcement actions" that targeted many different participants in what DOJ characterized as a "complicated web of actors located across the world."[14]  DOJ now sought to "shut down several other actors who work with the mailers to carry out these schemes,"

---

[14]    Press Release, Dep't of Justice, Justice Department and Law Enforcement Partners Announce Civil and Criminal Actions to Dismantle Global Network of Mass Mailing Fraud Schemes Targeting Elderly and Vulnerable Victims (Sept. 22, 2016), https://www.justice.gov/opa/pr/justice-department-and-law-enforcement-partners-announce-civil-and-criminal-actions-dismantle

including: a printer based in India that "manufactures the solicitations and arranges for bulk shipments to U.S. victims;" a payment processor based in Canada that among other things received payments from victims; and two list brokers.[15]

One of those list brokers was the Company. The DOJ commenced a civil injunction proceeding against the Company, alleging that it and one of its employees (not Mr. Newman) had "rented lead lists to . . . fraudulent direct mailers" who the Company and its employee "knew would use the lists to personalize and address hundreds of thousands of solicitation packets to potential victims across the United States."[16] The DOJ also executed a search warrant of the Company's offices.

 Faced with this investigation, the Company took quick action. The DOJ's investigation primarily focused on mailings involving astrology and sweepstakes offers, areas in which Mr. Newman represented many clients.[17] The Company terminated Mr. Newman, and began negotiations with the DOJ in an effort to resolve the civil proceedings. In or about February 2017, it consented to a civil injunction requiring it to cease mailings in astrology and sweepstakes, and to adopt measures to ensure its compliance.[18]

### G. **The Indictment**

Approximately three and one-half years after his forced retirement, on or about March 9, 2020, the DOJ brought this prosecution against Mr. Newman. The indictment contains one count

---

[15]  *Id.*

[16]  *Id.*

[17]  Complaint, *United States v. BDK Mailing GMBH, et al.,* Civ. No. 16-05264, https://www.justice.gov/opa/file/895146/

[18]  Consent Decree and Final Judgment, *United States v. BDK Mailing GMBH, et al.,* Civ. No. 16-05264, https://www.justice.gov/opa/press-release/file/1013356/

alleging conspiracy to commit mail and wire fraud, and fifteen counts alleging substantive wire fraud, with each count based on a separate email sent or caused to be sent by Mr. Newman.

The indictment does not allege that Mr. Newman himself made any knowingly false statements. Nor, notably, does it allege that Mr. Newman engaged in a conspiracy with the parties who *were* making the allegedly false statements: the mailers themselves. Rather, the indictment charges that he conspired with unidentified persons *other* than the mailers, who also "acted as list brokers for fraudulent mass mailers." (Indictment ¶ 6.) The object of this conspiracy was to "help[] [the] fraudulent mass mailers acquire lists of potential victims." (Indictment ¶ 5.) Thus, the indictment appears premised on a theory of aiding and abetting -- that Mr. Newman agreed with other list brokers to aid and abet the fraudulent mailers. It provides no clues as to the identity of those other list brokers, or indicate whether they worked at the Company or elsewhere.

While the indictment's primary wrongdoers are the "fraudulent mass mailers," it also does not identify them by name or type, nor does it identify the types of mailings that the government contends were fraudulent. Nor does it allege the types of representations that it characterizes as "false" or "fraudulent," with two exceptions: first, the mailers' letters were "personalized to each recipient when, in actuality, the same letters were sent to thousands of consumers" (Indictment ¶ 6), and second, the mailers "operated under false names." (*Id.*) Beyond these two specific examples, the indictment provides no other insight as to the representations, if any, that the government contends were false. The indictment does contain a catch-all allegation that each letter was "intended to mislead the consumer into believing they would receive a large amount of money" (*id.*), but even here, the indictment only refers to the mailer's intent, and does not specifically allege how or whether any specific statements that flowed from that intent were false.

## ARGUMENT

The indictment violates of Mr. Newman's Fifth Amendment right to due process, and should be dismissed.  In the alternative, in the event the Court declines to dismiss, the Court should order a bill of particulars.

### POINT I

### THIS PROSECUTON VIOLATES MR. NEWMAN'S RIGHT TO DUE PROCESS UNDER THE FIFTH AMENDMENT OF THE CONSTITUTION

Before the government may subject an individual to criminal prosecution, the Fifth Amendment requires that the government provide that individual with prior notice that her conduct is unlawful.  *United States v. Lanier*, 520 U.S. 259, 267 (1997).  The "touchstone" of the fair warning requirement is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.*  Furthermore, due process requires that "the person of ordinary intelligence" must have a "reasonable opportunity to know what is prohibited." *Upton v. SEC,* 75 F.3d 92, 98 (2d Cir. 1996); *see also United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000) (finding that fair warning means that a defendant's "case must be 'plainly and unmistakably' within the provision of some statute"). Here, the government failed to provide Mr. Newman with fair warning and therefore this prosecution violates his constitutional right to due process.

First, the industry specific laws and regulations applying to list brokers provided no notice that they would bear responsibility for the substance of their clients' mailings, or had an obligation to police them prior to brokering a transaction.  In this respect, the legal framework for mailings differs dramatically from that governing the activities of list brokers working with telemarketers. In the latter context, the Telemarketing Sales Rule promulgated by the FTC in 1995 included an "assisting and facilitating" provision that made explicitly clear that anyone who provided

"substantial assistance or support" to a telemarketer with knowledge of its deceptive conduct would violate the Rule. That same year the FTC issued a statement confirming that the provision of list brokerage services would constitute such "substantial assistance." 60 Fed. Reg. 43842 (Aug. 23, 1995). And then in 2004 the FTC entered into the consent decrees in the 2004 FTC Proceedings, which not only held list brokers' responsible for the fraudulent statements of their telemarketing clients, but also explicitly required list brokers to review telemarketing clients' sample scripts before brokering a transaction.

The law and regulations provided no similar guidance to list brokers working with direct mailers. Congress passed no law similar to the Telemarketing Fraud Prevention Act, authorizing the FTC to issue detailed rules governing the conduct of mass mailings. The FTC issued no rule similar to the Telemarketing Sales Rule, subjecting list brokers to liability for deceptive mailings sent by their clients. And the FTC issued no Consent Decrees similar to those in the 2004 FTC Proceedings, explicitly requiring list brokers to police their clients' sample mailings. Indeed, the statute used by the FTC to prosecute fraudulent mass mailers, Section 5(a) of the FTC Act, does not even include an aiding and abetting provision, an absence bemoaned by the FTC itself as prejudicing its ability to bring charges against those providing assistance to fraudsters.

Second, the government's enforcement activities also failed to provide list brokers any notice that they would bear responsibility for the substance of their clients' mailings. While the FTC brought many fraud cases against direct mailers, it did not, consistent with the limitations of the FTC Act, include charges against list brokers based solely on their list brokerage work for such clients. And prior to its September 2016 initiative, the DOJ never criminally prosecuted a list broker based upon alleged misstatements in its client's mail pieces. Indeed, our research has disclosed no case in which the DOJ even brought civil proceedings on such a theory.

Third, not only did the government fail to inform Mr. Newman that his conduct as a list broker would subject him to criminal prosecution, in its sole direct contact with Mr. Newman prior to commencement of this case it communicated exactly the opposite. In the *Henningsen* case, the DOJ sought Mr. Newman's assistance as a government witness in its criminal prosecution of two of his clients, who had sent out a fraudulent mailing that bilked victims out of millions of dollars. That mailing was fraudulent on its face, and Mr. Newman had worked closely with the defendants, communicating with them on a monthly basis. Thus, Mr. Newman had engaged in the same conduct that the DOJ now characterizes as criminal: assisting mass mailers in acquiring mailing lists of individuals who would receive the fraudulent mailing.

Yet the DOJ never suggested to Mr. Newman that his conduct was improper. To begin with, it did not charge him as a co-conspirator. Nor, in requesting his testimony, did DOJ inform Mr. Newman that he needed the benefit of an immunity order or non-prosecution agreement, or even his own counsel. Instead, it put him on the stand without any protection, for the specific purpose of establishing the falsity of the very mailings at issue. The message that DOJ delivered to Mr. Newman through this treatment was that he had done nothing wrong.

In *Upton v. SEC*, the Second Circuit overturned a Securities and Exchange Commission ("SEC") Order based upon similar due process considerations. The SEC Order had found that the CFO of a brokerage firm failed to supervise a subordinate who had followed a weekly practice of paying down customer secured loans solely to comply with reserve calculation requirements, and then reinstating the loans immediately following those weekly calculations. 75 F.3d at 93-94. The SEC charged this as a violation of SEC Rule 15c3-3(e), but the Second Circuit overturned that order because the SEC had not clearly articulated that the conduct was unlawful. 75 F.3d at 98. The Second Circuit noted that the pay-down practice was "standard procedure" at several other

brokerage firms, and while the SEC had been aware of the practice for several years it "took no steps to advise the public that it believed the practice was questionable." *Id*. at 94, 98. The court concluded that "[t]he Commission may not sanction Upton pursuant to a substantial change in its enforcement policy that was not reasonably communicated to the public." *Id* at 98.

Here, the same considerations require dismissal of the indictment. The government has undoubtedly been aware of the activities of list brokers for many years, at the very least since 1995 when the FTC promulgated the Telemarketing Sales Rule. Certainly by 2012, when DOJ called Mr. Newman as a government witness in the *Henningsen* case, the DOJ had full awareness not just of the activities of list brokers as a class, but of Mr. Newman's specifically. Yet at no point prior to September 2016 did the DOJ seek to hold list brokers responsible for the mailings of their clients. As the Second Circuit stated in *Upton*, the government cannot change its standards for imposing liability without first articulating this policy change to the public and providing individuals with "a reasonable opportunity to know what is prohibited." *Id.* at 98.[19]

Indeed, the due process concerns underlying *Upton* -- a civil case -- figure even more prominently in a criminal case in which Mr. Newman's liberty is at stake. The government may of course change its enforcement priorities over time, but to do so with a criminal case is fundamentally unfair and improper. That injustice would be particularly harsh where, as here, the government not only failed to provide any prior notice of its change in policy, but itself previously

---

[19]    Numerous Second Circuit decisions hold that the government must communicate that an activity is criminal before it can prosecute an individual for that activity. See *United States v. Brennan*, 183 F.3d 139, 149-50 (2nd Cir. 1999) (matter decided on venue grounds, but court found government's case "seriously problematic" where prosecution "pointed to no precedent for criminal liability" under the mail fraud statute for nondisclosures regarding reinsurance arrangements and earlier civil cases may have further led defendants to assume no criminal liability); *United States v. Tana*, 618 F. Supp. 1393, 1396 (S.D.N.Y. 1985) (granting motion to dismiss charged violation of 18 U.S.C. § 641, where court found "no instance during the 110 years since this section's adoption in which someone has been indicted under this statute for converting property in such circumstances"); *United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) (affirming dismissal due to failure of indictment to "charge a violation of a known legal duty," and because of "clear constitutional duty of the government to warn citizens whether particular conduct is legal or illegal" (internal citations omitted)).

relied on Mr. Newman as its own witness just four years prior to that change. Under these circumstances, the due process considerations expressed in *Upton* mandate dismissal.

The government will likely argue, notwithstanding the above, that Mr. Newman *did* receive fair notice under the Fifth Amendment. While it did not treat him as co-conspirator at the time of his 2012 *Henningsen* testimony, DOJ will contend, that experience at a minimum placed him on notice that the mailings of at least one of his clients were fraudulent. And the indictment recites other incidents that purportedly raised red flags concerning other clients. For example, a 2012 email informed Mr. Newman that a list owner would not consent to the rental of his list to a particular mailer because he believed the mailing made it appear "that the person is getting a check sent to them for lots of money and seemingly no qualifiers." (Indictment ¶ 8.) A 2009 news article described how a mailer had been arrested for letters requesting victims to send a processing fee in order to claim a sweepstakes prize. (Indictment ¶ 9.) On other occasions, the indictment contends, Mr. Newman received notice of law enforcement action focused on his clients, yet continued to do business with them, and even helped manage the disruption caused their business. (Indictment ¶ 10.)[20]

Such purported red flags, however, do not alter the legal and regulatory framework imposed by the government going back to at least 1995. As discussed above, that framework provided Mr. Newman no notice that he would bear criminal responsibility for his client's mailings, or that the list broker had an obligation to review and police such mailings. Indeed, in the *Henningsen* case, he had brokered lists for mailings that were fraudulent on their face – surely

---

[20]    The government may also argue that, since the date of its September 2016 initiative, it has obtained guilty pleas from cooperating defendants based on their work as list brokers prior to that date, and in order to enter those pleas the cooperators must have had notice of the wrongfulness of their conduct. The state of mind of such cooperating defendants, either at the time of their conduct or at the time of their decision to cooperate with the government, however, bears no relevance to Mr. Newman's state of mind, particularly given Mr. Newman's direct personal contact with the DOJ in connection with his *Henningsen* testimony.

a red flag -- and yet the DOJ embraced him as a government witness without any need for immunity. Having solicited Mr. Newman's testimony, DOJ cannot now reframe the same conduct that he described to treat him as a co-conspirator, without first notifying him of its change in position. DOJ failed to do that, and therefore due process requires dismissal of the indictment.

### POINT II

### IN THE ALTERNATIVE, THE COURT SHOULD ORDER THE GOVERNMENT TO PROVIDE A BILL OF PARTICULARS

The indictment fails to include critical elements of the offense charged, warranting a bill of particulars to enable Mr. Newman to prepare his defense.

### A. Applicable law

Rule 7(f) of the Federal Rules of Criminal Procedure permits the Court to grant a bill of particulars where necessary to provide defendant with sufficient information about the nature of the pending charges, thereby enabling him to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted for the same offense. *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). In determining whether to grant a bill of particulars, the "crucial question is whether the information sought is necessary, not whether it is helpful." *United States v. Calhelha*, 456 F. Supp. 2d 350, 365 (D. Conn. 2006) (internal citation omitted). The defendant is entitled to disclosures necessary to his defense, even if the requested information reveals the prosecution's evidence or theory of the case. *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998).

Further, while the government may also provide particularized information about a defendant's charges through discovery materials, the government cannot "fulfill its obligations merely be providing mountains of documents to defense counsel." *Bortnovsky*, 820 F.2d at 575. In *Bortnovsky*, the government charged the defendants with conducting fake burglaries in order to

submit false burglary insurance claims.  However, the indictment failed to specify the dates of the alleged burglaries or identify which of the numerous insurance claims were allegedly fraudulent. *Id.* at 574.  The Second Circuit reversed the defendants' convictions, finding that the district court erred in failing to grant a bill of particulars "which was vital to [defendants'] understanding of the charges pending and to the preparation of a defense."  *Id.*at 575.  The court concluded that the government failed to fulfill its disclosure obligations by simply providing 4,000 insurance documents without further guidance as to which documents were false.  *Id.* at 574-75; *see also United States v. Davidoff*, 845 F2d 1151, 1155 (2d Cir. 1988) (district court erred in failing to order a bill of particulars, even when government produced 6,000 pages of discovery materials).

Second Circuit courts frequently order the government to provide a bill of particulars where the government produces an enormous number of documents without indicating which of those documents demonstrate the charged fraud.  For instance, in *United States v. Nachamie*, the government alleged Medicare fraud and "produced over 200,000 pieces of paper in hundreds of boxes and files, relating to 2,000 Medicare claims" without indicating which of the claims were fraudulent.  91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000).  The court ordered the government to provide a bill of particulars after finding that the government had "not yet informed the defendants which of these claims were false and in what way they were false."  *Id.*

Likewise, in *United States v. Savin*, 2001 U.S. Dist. LEXIS 2445 (S.D.N.Y. Mar. 7 2001), the court ordered a bill of particulars, even when the government produced more than 100,000 pages of discovery. There, the government alleged an unspecified series of "intercompany transfers" to pilfer client money, but without identifying the amounts, dates, means and methods of the conspiracy, or corporate identities involved.  The court asserted, "[a]bsent further information, in order to adequately understand the nature of the charges against him, Savin will be

forced to comb through this veritable mountain of documents and to attempt to guess which of the numerous transactions documented therein, and conducted over a six-year period, are alleged by the government to have been improper." *Id.* at 10.  The court concluded that placing such a burden on the defendant was unacceptable.

In determining whether to grant a defendant's request for the names of unindicted co-conspirators, courts in the Second Circuit consider: "(1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the Government otherwise has provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government's investigation." *Nachamie* 91 F. Supp. at 572.  In *Nachamie*, the court found that revealing the identities of co-conspirators was necessary where, among other things, the alleged conspiracy operated over a significant period of time (three years) and the government produced more than 200,000 pages of materials without providing guidance on the particulars of the charges. Further, the court observed that in fraud cases, unveiling the identities of co-conspirators was unlikely to endanger them. *Id*.

Similarly, in *Savin*, the court granted defendant's request for a list of co-conspirators. The court emphasized the potentially large number of co-conspirators spanning multiple companies, the length of the conspiracy (six years), the lack of notice regarding the particulars of the conspiracy allegations, and the government's "extraordinarily voluminous" discovery materials. *Savin* 2001 U.S. LEXIS at *15.  Additionally, the court observed that where "extensive investigation…has already been accomplished due to the civil litigation" concerning "the same underlying events," the government's investigation was unlikely to be damaged by providing a list of co-conspirators. *Id.* at *15-16.  See also *United States v. White*, 753 F. Supp. 432, 433-34 (D.

Conn. 1990) (granting a bill of particulars, even where the government filed a detailed criminal complaint and provided substantial discovery materials, because "certain items are properly disclosed to a defendant through a bill of particulars…[including] the names of all persons the Government will claim to have been co-conspirators"); *United States v. Rodriguez*, 1990 U.S. Dist. LEXIS 17795 at *3 (D. Conn. 1990) (granting a bill of particulars for "the names of all persons the government will claim to have been co-conspirators"); *United States v. Luna*, 2006 U.S. Dist. 32474 at *7-8 (S.D.N.Y. May 17, 2006) (denying a motion for reconsideration of an order granting a bill of particulars for co-conspirators' identities where a "bill of particulars is necessary to bring focus to the massive amounts of discovery produced and the lengthy open-ended conspiracy charged").

### B.  Discussion

Based on these authorities, the Court should order a bill of particulars, since the indictment fails to provide Mr. Newman notice of the core elements of the charges against him.

First, the indictment does not allege the principal wrongdoers in the conduct alleged, the "fraudulent mass mailers."  The indictment covers a lengthy eleven-year period, during which Mr. Newman brokered mailing lists for many thousands of mailings for many hundreds of clients. During the same period other list brokers, charged in the indictment as Mr. Newman's co-conspirators, presumably brokered similar numbers of mailings for similar numbers of clients.  The resulting scope, particularly without identification of the alleged co-conspirators (see discussion below), is overwhelming.  Yet the indictment does not identify any "fraudulent mass mailers," or even describe their qualities or characteristics.  Since these mailers are the cornerstone of the government's case, it should identify them.

Second, the indictment fails to allege, or provide any insight into the identity of, Mr. Newman's co-conspirators. As discussed above, rather than charge a conspiracy with the "fraudulent mass mailers," the indictment charges a conspiracy to aid and abet those principal wrongdoers. Thus, Mr. Newman's alleged co-conspirators are not the mailers, but other list brokers. Yet the indictment provides no insight into the identity of those alleged co-conspirators, either by name, role or category. Indeed, the indictment does not make clear whether these list brokers worked at the Company or at other firms. Over the course of the eleven years charged in the indictment, not to mention his 40 year career, Mr. Newman had dealings with hundreds of list brokers, list managers and list owners. Without an understanding of which brokers the government contends were his co-conspirators he cannot prepare his defense.

Identification of the alleged co-conspirators is critical for at least two additional reasons. To the extent some of the alleged co-conspirators worked at other firms -- the Company's competitors -- that would call into question whether the conspiracy alleged in fact amounts to a single conspiracy. In that case, Mr. Newman would have motions based on the indictment's duplicity, and possibly the statute of limitations, to the extent an improperly joined conspiracy was time-barred. But without identification of the co-conspirators, Mr. Newman cannot pursue such defenses. Also, to the extent the government seeks to offer the statements of co-conspirators at trial, it is critical for Mr. Newman to know beforehand exactly who the government places within the alleged conspiracy. Without this identification, Mr. Newman will be taken by surprise and these critical evidentiary issues cannot even be identified, much less addressed, prior to trial.[21]

Third, the indictment fails to allege the particular mailings that the government contends were fraudulent. Mr. Newman brokered mailing lists for many thousands of mailings over the

---

[21] Given the nature of this case, disclosure of co-conspirators would raise no issues of potential danger to those persons or potential harm to the government's investigation. See *Nachamie*, 91 F. Supp. at 573.

eleven-year period charged, but the indictment leaves unstated exactly which ones, or even which types, the government contends were fraudulent. These "fraudulent letters" form the heart of the government's case and will give rise to numerous factual issues, including: was the letter in fact misleading? did the letter include disclaimer language? did Mr. Newman in fact broker a mailing list for that particular letter? did Mr. Newman have any meaningful awareness of the letter's substance? These and other questions will require extensive investigation to explore, but Mr. Newman can only undertake such investigation if the government specifies the letters it contends were fraudulent.

Indeed, the indictment does not even describe the fraudulent letters by type or category. While it refers in passing to mailings offering "personalized psychic services" (Indictment ¶ 6) or a "sweepstakes prize" (Indictment ¶ 9), these passing references fall short of an exhaustive list, and do not make clear whether the government also views other categories as fraudulent. Nor do these references make clear whether the government views all mailings in the psychic or sweepstakes categories as fraudulent, notwithstanding, for example, the presence of disclaimer language. Rather than particularize these core contentions, the indictment falls back on frequent but generic references to "fraudulent mass mailings" and "fraudulent letters," leaving Mr. Newman to guess as to the scope of the government's case.

Fourth, with limited exceptions, the indictment fails to particularize the types of representations that it contends were false. The indictment specifically identifies only two representations as false: the personalization of mailings "to each recipient when, in actuality, the same letters were sent to thousands of consumers..." (Indictment ¶ 6); and the mailers' use of "false names." (*Id.*) But those representations did not go to the core of the offers made by the mailers, or whether those offers were fulfilled or completed by the mailers. As to that issue, the indictment

provides only the generic statement that "each letter was intended to mislead the consumer into believing they would receive a large amount of money, a valuable prize, or personalized psychic services upon payment of a fee to the mass mailers . . . ." (Indictment ¶ 6.)  Even here, though, the indictment refers only to the mailer's intent, and leaves unstated whether the letter was in fact misleading, whether the recipient in fact received the prize or services described, or whether Mr. Newman had any awareness of such matters.[22]  This allegation thus leaves Mr. Newman guessing as to the scope of the government's theory.

Finally, the indictment provides no meaningful specifics as to dates or times.  While providing a few scattershot instances of red flags that purportedly put Mr. Newman on notice of mailer misconduct, for example a list owners' email objecting to a sample the owner considered misleading in February 2012, the indictment gives no systematic description of the core conduct at issue, nor does it include any overt acts in furtherance of the conspiracy.  Given the eleven-year length of the conspiracy charged, this level of specificity is inadequate, and fails to enable Mr. Newman to prepare his defense.

In pointing out these flaws, we recognize that the government has produced extensive discovery, which includes not only the underlying documents but also grand jury testimony and memoranda of witness interviews.  But this discovery cannot definitively answer the most fundamental questions raised by the DOJ's novel indictment: who were Mr. Newman's alleged co-conspirators? What mailers and mailings does the government contend were fraudulent?  What specific representations does the government contend were false?  These questions go to the heart of the government's theory, and can only be addressed by a bill of particulars.

---

[22]    This omission is likely intentional, since list brokers like Mr. Newman were not in a position to know whether mailers in fact fulfilled the offers made in their mailings.  Nevertheless, to prepare for trial, Mr. Newman must know which representations the government contends are relevant and fraudulent.

Indeed, the voluminous discovery produced by the government compounds, rather than alleviates, Mr. Newman's predicament.  Like the length of the eleven-year conspiracy charged, the amount of discovery produced by the government is extensive, consisting of 1.35 terabytes of data.  As Mr. Newman noted in his motion to set a pretrial schedule (Docket no. 26), review of that discovery will require an estimated six months.  The government has agreed to soften that burden somewhat by identifying what it considers the most relevant documents, but even that list exceeds 1,000 items.  This volume of discovery, when combined with the lengthy and ill-defined nature of the conspiracy charged, heightens the need for a bill of particulars.

**POINT III**

**THE COURT SHOULD ORDER THE GOVERNMENT
TO PROVIDE ADDITIONAL PRETRIAL DISCOVERY**

For the same reasons that Mr. Newman requests a bill of particulars, he also seeks the production of other discovery and information in the period before trial.  Due to the duration and complexity of the alleged conspiracy, as well as the enormous volume of discovery produced by the government, these pretrial disclosures are necessary, in the interest of fairness and justice, to prevent undue surprise and to permit Mr. Newman to prepare for trial.

**A.  Notification of Intent to Use 404(b) Evidence**

Upon request by a defendant, the government must provide reasonable notice in advance of trial of the "[e]vidence of other crimes, wrongs, or acts" that the government "intends to offer at trial."  Fed. R. Evid. 404(b).  A longer notice period "is appropriate [where there is an] absence of any threat to the safety of prospective witnesses" and the 404(b) evidence is important to the action. *Nachamie*, 91 F. Supp. 2d at 577 ("The Government has offered no good reason why it should not notify defendants well in advance of trial of its intent to offer such [404(b)] evidence.")

27

Here, given the overwhelming volume of materials produced and the lack of sufficient notice provided even as to the matters charged in the indictment, the government should be compelled to provide 404(b) notice at least 90 days prior to trial, by December 1, 2020.

### B.  Identification of Trial Exhibits

Mr. Newman requests that the Court order the government to identify which documents it intends to use in its case-in-chief by January 1, 2021.

Thus far, the government has taken steps to narrow the 1.35 terabytes of data that they produced down to a more limited selection of documents that they have indicated represent potential trial exhibits.  However, this leaves around 1,000 documents as potentially relevant, and the government has not identified any of them as actual trial exhibits.  Because the indictment fails to specify the particular mailings that the government contends were fraudulent or provide any meaningful specifics as to the dates or times of the alleged unlawful conduct within a conspiracy spanning eleven years, the identification of documents that the government intends to use in its case-in-chief takes on even greater importance.  *United States v. Giffen*, 379 F. Supp. 2d 337, 344 (S.D.N.Y. 2004) (holding that "based on the policy concerns of Rule 16 and principles of fairness, it is within a district court's authority to direct the Government to identify the documents it intends to rely on in its case in chief"); *see generally United States v. Cannone*, 528 F.2d 296, 298 (2d Cir. 1975) (recognizing a district court's inherent authority to regulate the nature and timing of discovery).

### C.  Identification of Trial Witnesses

Mr. Newman requests a list of the witnesses that the government intends to call 60 days in advance of trial.  The court may compel the government to provide pre-trial disclosure of the

identity of witnesses if such disclosure is material to the preparation of the defense and reasonable in light of the circumstances of the case. *Nachamie*, 91 F. Supp. 2d at 579.

In determining whether to require production of a witness list, the *Nachamie* decision noted that courts often look to the factors set out in *United States v. Turkish*, 458 F. Supp. 874, 881 (S.D.N.Y. 1978).[23] Each of these factors favors compelling production of a witness list in this case. First, the indictment does not charge the defendant with a violent crime and witnesses face no risk of violence. Second, Mr. Newman has never been arrested or convicted for a violent crime—or, in fact, charged in any criminal matter prior to this case. Third, the evidence in the case will largely consist of testimony relating to documents. Fourth, disclosing the names of government witnesses prior to trial is not likely to make them unwilling to testify. Fifth, the indictment alleges a protracted conspiracy, extending eleven years. Sixth, and finally, the defense of these charges will be extremely expensive given the volume of documents produced by the government. All of these factors suggest that the court should compel the government to provide a list of witnesses.

Courts regularly compel the government to produce lists of witnesses in cases where, as here, the government has produced an enormous volume of discovery and the conspiracy is alleged to have taken place over more than a year. *See, e.g., Nachamie* 91 F. Supp. 2d at 579 (over 200,000 pages of documents produced and an alleged three-year conspiracy); *Turkish* 451 F. Supp. at 881 (25,000 documents and a fifteen month period); *United States v. Rosenthal*, 1991 U.S. Dist. LEXIS 17363 at *10-12 (S.D.N.Y. Dec. 2, 1991) (voluminous discovery and a three year conspiracy).

---

[23] Those factors are stated as follows: "(1) Did the offense alleged in the indictment involve a crime of violence? (2) Have the defendants been arrested or convicted for crimes involving violence? (3) Will the evidence in the case largely consist of testimony relating to documents (which by their nature are not easily altered)? (4) Is there a realistic possibility that supplying the witnesses' names prior to trial will increase the likelihood that the prosecution's witnesses will not appear at trial, or will be unwilling to testify at trial? 5) Does the indictment allege offenses occurring over an extended period of time, making preparation of the defendants' defense complex and difficult? (6) Do the defendants have limited funds with which to investigate and prepare their defense?"

### D.  **Sharing of Summary Charts**

Mr. Newman requests that the government provide any summary charts at least 30 days prior to trial.  In *Nachamie*, the government agreed to provide draft charts summarizing the hundreds of alleged incidents of Medicare fraud 45 days prior to trial. 91 F. Supp. 2d at 571.  Here, where the government alleged such a lengthy conspiracy during which time Mr. Newman engaged in countless list brokering activities, the early production of summary charts is required.

### E.  **Production of 18 U.S.C. § 3500 Materials**

Mr. Newman requests that the government produce 3500 materials generated in the course of the government's trial preparation by February 1, 2021.  In making this request, Mr. Newman recognizes that the government has already produced grand jury testimony and memoranda of interviews for a number of individuals, some of whom may be prospective witnesses.  However, Mr. Newman has received no assurance that this discovery represents the entirety of the government's currently existing 3500 material, and of course the government will generate additional 3500 material in preparation for trial.  The complexity of the matters at issue, and volume of documents produced in discovery, necessitate that the government produce any additional 3500 material 30 days in advance of trial.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Mr. Newman's motion to dismiss. In the alternative, in the event the Court denies that motion to dismiss, the Court should grant Mr. Newman's motion for a bill of particulars and request for additional pretrial disclosures.


Dated: June 29, 2020

Respectfully submitted,

DOUGLAS R. JENSEN, ESQ PHV #8628
White & Case, LLP
1221 Avenue of the Americas
New York, NY 20020-1095
Douglas.Jensen@whitecase.com
(212) 819-8513

*Attorney for Norman Newman*